IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:19-CT-03315-M

| | | |
|---|---|---|
| JUSTIN MICHAEL TYSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| LIEUTENANT GAY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

This cause is before the court on plaintiff's motions for summary judgment, and the joint

motion for summary judgment of defendants Andrews, Gay, Jordan, McDaniel, Russell, Singleton

III, Taylor, and Woolard.    See Mot. [D.E. 105]; Mot. [D.E. 116], Mot. [D.E. 179].

Relevant Procedural History:

On October 29, 2019, Justin Michael Tyson ("plaintiff"), a Pitt County Detention Center

("Detention Center") pretrial detainee proceeding without prepayment of fees, filed *pro se* a

complaint under 42 U.S.C. § 1983.    [D.E. 1, 2, 5].    Plaintiff twice moved to amend his initial

complaint.    See [D.E. 9, 10].

In the operative complaint, plaintiff names as defendants Detention Center Lieutenant Gay

and Officers McDaniel, Jordan, Andrews, Taylor, Russell, Singleton III, and Woolard

(collectively, the "moving defendants").    2d. Am Compl. [D.E. 10] at 3–6.    Plaintiff alleges that,

between December 14 and 15, 2017: the moving defendants, (aside from Gay) used excessive

force against him, slamming him on his face and causing both a "busted forehead" and a dislocated

hip; Gay "denied me outside medical treatment for my injury, leaving me in a cell in excruciating

and unbearable pain for a 28-hour time period"; "officers would not let nurses bring medication

inside my cell while my hip was dislocated"; "my morning and lunch meals were not brought inside my cell while I could not walk"; he was treated differently from other inmates over a minor violation; he was denied medication and attention from an outside medical provider; "harassment took place on various occasions" after the incident; he underwent right hip surgery on December 15, 2017; and he continues to suffer the mental and physical effects due to this incident. See id. at 7–9. For relief, plaintiff seeks, among other things, monetary damages. Id. at 10.

On January 8, 2020, the case was reassigned to the undersigned judge via a text order.

On August 18, 2020, the court granted plaintiff's motions to amend, conducted its initial review of the complaint as amended, and allowed the action to proceed in part as to plaintiff's excessive force and deliberate indifference claims, but dismissed the claims premised on the Fourteenth Amendment's Equal Protection Clause and the Fifth Amendment. Order [D.E. 11].

On October 16, 2020, the moving defendants filed a joint motion to dismiss the complaint for failure to state a claim, Mot. [D.E. 33], together with a memorandum in support [D.E. 34]. Plaintiff responded in opposition to these defendants' joint motion to dismiss. See [D.E. 40, 44].

On September 22, 2021, the court, *inter alia*, granted in part the moving defendants' motion to dismiss as to claims against them in their official capacities, but denied the motion on all other grounds, finding that plaintiff had plausibly alleged a viable deliberate-indifference claim as to Gay and viable excessive-force claims as to the other moving defendants. See Order [D.E. 55].

On October 5, 2021, the moving defendants answered the complaint. See [D.E. 59–66].

On October 18, 2021, plaintiff moved for joinder, seeking to add as defendants Detention Center officers Mobley ("Mobley") and Sergeant Page ("Page"). Mot. [D.E. 72]. The court denied this motion, Order [D.E. 92], and plaintiff moved for reconsideration, Mot. [D.E. 93].

2

On March 18, 2022, plaintiff filed a motion summary judgment, Mot. [D.E. 105], with a memorandum in support and a statement of facts, see [D.E. 105-1], and an affidavit [D.E. 105-2].

On April 11, 2022, the moving defendants filed a joint motion for summary judgment, Mot. [D.E. 116], with a memorandum in support [D.E. 117], a statement of material facts [D.E. 118], and an appendix [D.E. 119]. Pursuant to Roseboro v. Garrison, 528 F.2d 309, 310 (4th Cir. 1975) (per curiam), the court notified plaintiff about the moving defendants' motion, the consequences of failing to respond, and the response deadline. [D.E. 120].

On May 11, 2022, the moving defendants filed a response in opposition to plaintiff's motion for summary judgment [D.E. 129], together with a statement of material facts [D.E. 130].

On May 16, 2022, the court, among other things, granted plaintiff's motion for reconsideration, joined Page and Mobley as defendants, and allowed the operative second amended complaint to proceed against Page and Mobley. Order [D.E. 132].

On May 20, 2022, plaintiff filed, among other things, a memorandum of law in opposition to the moving defendants' joint motion for summary judgment, Pl.'s Mem. [D.E. 133].

On May 31, 2022, plaintiff filed a supplemental response in opposition the moving defendants' joint motion for summary judgment. Pl.'s Supp. Resp. [D.E. 136].

On July 28, 2022, Mobley moved to dismiss the complaint for failure to state a claim, Mot. [D.E. 160] (citing Fed. R. Civ. P. 12(b)(6)), and filed a memorandum in support, [D.E. 161].

On August 5, 2022, Page answered the complaint. [D.E. 162].

On August 8, 2022, plaintiff responded to Mobley's motion to dismiss. [D.E. 164].

On August 11, 2022, Mobley filed a reply to plaintiff's response. [D.E. 165].

On August 16, 2022, the court denied Mobley's motion to dismiss. Order [D.E. 167].

3

On September 6, 2022, Mobley answered the complaint [D.E. 175], and moved to deem the answer timely filed, Mot. [D.E.176]. The court granted this motion. Order [D.E. 178].

On October 21, 2022, plaintiff moved for summary judgment as to Mobley and Page, Mot. [D.E. 179], and filed a memorandum in support [D.E. 179-1], a statement of facts [D.E. 179-2], an affidavit [D.E. 179-3], an appendix [D.E. 179-4], and exhibits [D.E. 179-5].

Factual Disputes:

The facts are substantially disputed. The parties generally agree that plaintiff caused a disturbance in the Detention Center booking area on December 14, 2017. Compare Defs.' Stmt. Mat. Facts [D.E. 118] at ¶¶26–27, 40–45 (stating: on the morning of Dec. 14, 2017, twenty inmates in civilian clothes were at the booking area for transfer to other facilities; during examination of his personal property bag, plaintiff became agitated, moved around, slapped his hands together, shouted and swore; Jordan and Andrews "interpreted [his] actions as a sign of aggression, that, combined with his volatile institutional history, were indications that [he] could become physically violent in the near future"; although commanded to calm down, plaintiff continued to talk loudly and use profanity; when informed the property bag did not have papers containing his "inventions," "Plaintiff grew even more agitated, continued swearing and throwing his hands in the air, and began to accuse detention facility personnel of stealing his ideas."), with Pl.'s Stmt. Mat. Facts [D.E. 105-1] at ¶1 (acknowledging plaintiff was "not lowering his voice, yelling, and displaying attitude"), and Pl.'s Stmt. Mat. Facts. Opp'n Defs.' Mot. for Summ. J. [D.E. 133-1] at ¶41 (stating: "Plaintiff does have a history of infractions, however only one of those infractions involve any assaultive behavior"; that infraction "did not involve physical hand to hand combat," but instead "involved Plaintiff throwing a food tray and striking an officer on the leg"; "plaintiff has never

4

received any inmate tickets for threatening another inmate, instigating fights with another inmate, or engaging in fights with another inmate"; "with only one violent infraction, defendants could not assume that Plaintiff would become violent, even with a volatile institutional history [sic]").

The parties disagree which officers were then present in the booking area. Compare Defs.' Stmt. Mat. Facts [D.E. 118] at ¶¶30–33 (stating: Sergeant George, Mobley, Page, Jordan and Andrews were all present; McDaniel was present but "in a separate section"; but "Officers Russell, Singleton, Taylor, and Woolard, along with Sergeant Gay, were not present in the Booking Area that morning"), with Pl.'s Stmt. Mat. Facts. Opp'n Defs.' Mot. for Summ. J. [D.E. 133-1] at ¶¶30–33 (stating: "All defendants besides Lieutenant Gay were present in the booking area"; "McDaniel was not in a separate section of booking . . . he was one of the officers that helped . . . lift plaintiff off his feet and carry him to the holding cell immediately after the incident"; and Officers Russell, Singleton, Taylor, and Woolard, were present in the booking area . . . [and] Sergeant Gay arrived in booking with [Nurse] McLean immediately after the incident").

Mobley, Page, Jordan, and Andrews used force to restrain plaintiff, but the details are disputed. Compare Defs.' Stmt. Mat. Facts [D.E. 118] at ¶¶46–52, 55–56, 58 (stating: "Sergeant George instructed the detention officers to handcuff Plaintiff due to his increasingly aggressive behaviors"; plaintiff first put his hands behind his back but jerked away when Mobley approached to handcuff him; Page then controlled plaintiff's left arm and performed a single arm takedown; plaintiff physically resisted once on the ground; "Andrews attempted to immobilize Plaintiff's legs by folding his right leg behind his left knee and holding his right foot, so that restraints could be applied"; Jordan immobilized plaintiff's right arm; "Mobley controlled Plaintiff's torso and Sergeant Page controlled his left arm, while handcuffs and leg restraints were applied"; and the

5

use-of-force event "was over very quickly, within a matter of seconds"); with Pl.'s Stmt. Mat. Facts. Opp'n Defs.' Mot. for Summ. J. [D.E. 133-1] at ¶¶47–52 (stating: "plaintiff did not resist arrest [sic] . . . plaintiff did not jerk away from Officer Mobley but instead was pulled away from the window by his left arm by Sergeant Page while Officer Mobley was tempting [sic] to place handcuffs on him"; "defendants physically lifted [plaintiff] off [his] feet, tilted [him] forward and then slammed [him] face first on the concrete floor causing . . . a busted forehead"; "there was no single arm takedown performed by one single officer"; "plaintiff did not resist physically while he was on the ground after being suplexed [sic] face first on the concrete floor"; "after plaintiff was slammed[,] all movements by him ceased immediately"; and "there was no attempt to immobilize plaintiff's legs because Officer Andrews took control of his legs after he was on the ground[;] his legs were already immobile and they were under control once he was taken to the ground").

The parties disagree if the force used was necessary or excessive. Compare Pl.'s Stmt. Mat. Facts [D.E. 105-1] at ¶¶2–4, 6–7, 13–14, 29, 32–33 (stating: the use of force stemmed from a "minor violation" for which he was issued a "Category I Offense" for engaging in disorderly conduct; "there was no threat of physical violence or imminent danger posed to any officer or inmate because Plaintiff was only yelling and displaying an attitude and not lowering his voice"; "plaintiff did place his hands behind his back in order to be handcuffed"; the force used "was unnecessary because Plaintiff was only yelling, using profanity, and not obeying directive from staff members to calm down and lower his voice"; and the force used "was not justified" because he "was not resisting arrest [sic] or attempting to flee," he was not armed at the time, he "has been diagnosed with a mental disorder," and "plaintiff was under control of and apprehended by Officer Page when Officer Andrews folded his right leg behind his left leg [sic]"), and Pl.'s Stmt. Mat.

6

Facts [D.E. 179-2] at ¶¶11–17 (stating, because plaintiff was "under control of the Defendant-Officers and on the ground when he was injured," the force used was not justified), and Pl.'s Stmt. Mat. Facts. Opp'n Defs.' Mot. for Summ. J. [D.E. 133-1] at ¶¶51, 53–54 (stating: "plaintiff has only one infraction involving physical violence . . . [which] did not involve physical hand to hand combat"; "because plaintiff did not resist physically while he was on the ground . . . immediate action was not necessary to reestablish order"; the method of restraint employed by Andrews was not consistent with his training; and Andrews "did intend to, and did have reason to believe that the technique used would cause injury to Plaintiff . . . because when anyone folds any limb of the body by force, it can be reasonably inferred that injury could occur"), with Defs.' Stmt. Mat. Facts. Opp'n Pl.'s Mot. for Summ. J. [D.E. 130] at ¶¶1–2, 6–7, 13–14, 29, 32–33 (discussing plaintiff's actions prior to the use of force; admitting plaintiff was cited for a Class I violation, but denying this was the reason for the use of force; asserting force was used because "Plaintiff's aggressive behaviors, combined with his institutional history, led officers to the reasonable conclusion that plaintiff posed an immediate threat of violence and that said use of force was employed as a reasonably necessary method to restore institutional safety and order"; noting plaintiff's aggressive behavior continued to escalate; admitting plaintiff "initially put his hand behind his back but, when Officer Mobley approached to handcuff him, Plaintiff jerked away"; stating defendants "were trained in use-of-force methods, and the circumstances during which each is appropriate"; acknowledging plaintiff "has submitted evidence to support his assertion that he suffers from a mental disability" and that he was unarmed at the time); and Defs.' Stmt. Mat. Facts [D.E. 118] at ¶¶51, 53–54 (stating: "Given Plaintiff's established history of erratic and violent behavior, Officer Andrews believed immediate action was necessary to reestablish order and discipline"; Andrews'

7

method of restraint was "consistent with his training"; and "Andrews did not intend to, and had no reason to believe that the technique would, cause injury to Plaintiff").

Plaintiff complained of injury after the use of force, but the details are disputed. Compare Pl.'s Stmt. Mat. Facts. Opp'n Defs.' Mot. for Summ. J. [D.E. 133-1] at ¶57 (plaintiff began to complain of a hip injury "immediately after he made contact with the ground"), and Pl.'s Stmt. Mat. Facts [D.E. 105-1] at ¶¶8, 10, 34 (stating: defendants in the booking area knew he was injured; he was "suffering from unbearable pain due to a dislocated hip"; and he "was under control of [ ] Page when [Andrews'] use of force dislocated [his] hip"), and Pl.'s Stmt. Mat. Facts [D.E. 179-2] at ¶2 ("Plaintiff did acquire an injury on Dec. 14, 2017, due to the force that was used"), with Defs.' Stmt. Mat. Facts [D.E. 118] at ¶57 ("Between [ ] Page's takedown and the detention officers applying the handcuffs and leg restraints, Plaintiff began to complain of injury to his right leg"), and Defs.' Stmt. Mat. Facts. Opp'n Pl.'s Mot. for Summ. J. [D.E. 130] at ¶¶8, 10, 34 (stating: "While Defendants heard Plaintiff verbalize complaint of injury to his hip/leg, they did not observe any physical injury or deformity"; "Defendants admit that sometime between the Dec. 14, 2017 use of force and the Dec. 15, 2017 x-rays, Plaintiff sustained a dislocated hip"; and "Defendants further deny any factual contention that [ ] Andrews' use of force was the cause of Plaintiff's dislocated hip; the documents cited by Plaintiff do not support such an evidentiary contention").

The parties also disagree if plaintiff then asked to go to the hospital. Compare Pl.'s Stmt. Mat. Facts [D.E. 105-1] at ¶5 ("Gay, Andrews, Mobley, and Page were aware of and knew that Plaintiff wanted to go to the hospital the day that the injury (hip dislocation) occurred"); with Defs.' Stmt. Mat. Facts. Opp'n Pl.'s Mot. for Summ. J. [D.E. 130] at ¶5 (submitting "the exhibits

8

cited to by Plaintiff do not give any indication that Plaintiff specifically requested to go to the hospital. Rather, Defendants heard Plaintiff complain of generalized injury to his hip/leg.").

Plaintiff was taken via wheelchair to the Detention Center Medical Area, but the details are disputed. Compare Defs.' Stmt. Mat. Facts [D.E. 118] at ¶¶59–61 (once he was restrained, "the on-scene officers, along with [ ] Page, immediately secured Plaintiff in a wheelchair, and escorted him to the Medical Area for evaluation"; "Gay, who was stationed in nearby Classification, heard the commotion coming from Booking, but could not respond immediately"; and "[b]y the time he was able to respond, [ ] Gay observed, and joined, the other detention officers as they escorted Plaintiff to Medical"), and Defs.' Stmt. Mat. Facts. Opp'n Pl.'s Mot. for Summ. J. [D.E. 130] at ¶¶11, 17, 18 ("The on-scene detention officers transported Plaintiff to a nearby medical unit, via wheelchair, due to [his] complaints of injury"; "Detention officers immobilized Plaintiff with leg restraints and handcuffs, and placed him in a wheelchair, which would prevent him from walking, immediately following the . . . use of force"; and "Defendants that observed Plaintiff on December 14, 2017, heard [him] complain of leg/hip pain, but lack sufficient independent knowledge to determine whether [he] could walk independently."), with Pl.'s Stmt. Mat. Facts [D.E. 105-1] at ¶¶11, 17, 18 (stating: defendants "placed plaintiff in a wheelchair . . . due to his injury"; "plaintiff could not walk on his right leg after the use of force"; and defendants "in the booking area . . . were aware that Plaintiff was inable [sic] to walk on his leg and they did place him in a wheelchair for this reason"), and Pl.'s Stmt. Mat. Facts. Opp'n Defs.' Mot. for Summ. J. [D.E. 133-1] at ¶¶59– 61 (stating: he "was not immediately secured in a wheelchair and escorted to the medical area once he was restrained"; he "was instead placed in a holding cell for 10 to 15 minutes before being placed in a wheelchair to be taken to medical for evaluation"; Gay "could respond immediately"

9

and "responded to the booking area with Nurse McLean just after the incident took place," but "did not join the other detention officers as they escorted plaintiff to medical").

The parties agree that plaintiff was seen by Nurse Donna McLean but disagree as to the nature of the examination, whether plaintiff was disruptive, and whether his injury was apparent. Compare Defs.' Stmt. Mat. Facts [D.E. 118] at ¶¶62–67 (stating: "When plaintiff arrived at medical [Nurse] McLean . . . attempted to perform an examination, but plaintiff, who remained hostile and uncooperative, refused"; shortly thereafter, Russell "received a request for assistance from Medical"; Russell "had a good rapport with Plaintiff" and "had been requested to help facilitate some degree of compliance with Nurse McLean's attempts to assess [plaintiff's] complaints of injury"; "Russell's attempts to convince Plaintiff, who remained hostile and resistant, were unsuccessful"; "[b]ased upon her limited ability to conduct a visual evaluation, Nurse McLean opined that, given Plaintiff's ability to physically resist her attempts to conduct a medical examination, the injuries to his hip and/or leg could not be severe, and she cleared Plaintiff to return to a holding cell until such time as he calmed down and permitted medical personnel to conduct a physical examination"), with Pl.'s Stmt. Mat. Facts. Opp'n Defs.' Mot. for Summ. J. [D.E. 133-1] at ¶¶62, 64–67 (stating: he did not resist attempts to conduct examination, but "stated continually that McLean was hurting him more and that he needed to go to the hospital"; "Russell did not attempt to convince him to comply with McLean's exam . . . as the only officer present in the room . . . was Sergeant Gay"; "Nurse McLean refused to fully examine plaintiff because he was continually complaining of pain, and instead of her trying to investigate the source of pain, she told officers to take [him] to the D-5 unit because if Plaintiff could tell her to stop touching his leg then he was ok and nothing was wrong"; defendants should have informed the officer in charge

10

that EMS was necessary because plaintiff was unable to walk after McLean's exam and "because of [defendants'] complaint to medical personnel that plaintiff's right hip was broken [sic]"; and he "made McLean and Defendants aware on Dec. 14, 2017, that he needed to go to the hospital for outside care and that McLean was only increasing the already unbearable pain during her exam").

Plaintiff was changed out of his civilian clothes and taken to a cell, but the details are disputed. Compare Defs.' Stmt. Mat. Facts [D.E. 118] at ¶¶68–69 ("Russell, upon Plaintiff's request, aided Plaintiff in changing out of his civilian clothes and into a Detention Center smock"; and "Per Nurse McLean's instructions, [ ] Jordan, Mobley, Andrews, and Russell then transferred Plaintiff to a nearby holding cell"), with Pl.'s Stmt. Mat. Facts. Opp'n Defs.' Mot. for Summ. J. [D.E. 133-1] at ¶¶68–70 ("Plaintiff did not request Officer Russell to help him change out of his clothes"; "McDaniel helped [him] change out of his clothes into a safety smock"; he "was not transferred to a nearby holding cell," but instead was taken to a cell in the D-5 housing unit).

The parties disagree whether plaintiff's injury was apparent to defendants. Compare Defs.' Stmt. Mat. Facts [D.E. 118] at ¶70 ("At no point during their December 14, 2017, interactions with Plaintiff did any of the responding Defendant-Officers observe any physical injury, or deformity, to Plaintiff's legs or hips."), and Defs.' Stmt. Mat. Facts. Opp'n Pl.'s Mot. for Summ. J. [D.E. 130] at ¶¶8, 10, 34 (stating defendants "did not observe any physical injury or deformity"), with Pl.'s Stmt. Mat. Facts. Opp'n Defs.' Mot. for Summ. J. [D.E. 133-1] at ¶70 (stating: "At some point during the December 14, 2017, interactions with Plaintiff's dislocated hip, Defendants did observe a physical injury or deformity to Plaintiff's legs or hips as Defendants, and not plaintiff himself, relayed information to medical personnel that his right hip was broken [sic]"; and "there was obvious deformity present in Plaintiff's right hip and knee"), and Pl.'s Stmt.

11

Mat. Facts [D.E. 179-2] at ¶7 ("Mobley and Page did see an injury to Plaintiff's leg and hip at some point during the December 14, 2017, incident . . . because the deformity was obvious").

The parties generally agree that, on the morning of December 15, 2017: plaintiff was extracted from the cell by the Emergency Response Team and taken to the Detention Center's medical unit; x-rays were then taken that revealed his right hip was dislocated; plaintiff was transferred via ambulance to Vidant Medical Center where medical professionals performed a reduction of his dislocated hip; and "he was discharged from Vidant, and returned to the Detention Center, later that afternoon." See Defs.' Stmt. Mat. Facts [D.E. 118] at ¶¶71–78; Pl.'s Stmt. Mat. Facts. Opp'n Defs.' Mot. for Summ. J. [D.E. 133-1] at ¶¶71–78.

Legal Standard:

Summary judgment is appropriate when, after reviewing the record as a whole, the court determines that no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party seeking summary judgment must initially demonstrate the absence of a genuine issue of material fact or the absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, see Anderson, 477 U.S. at 247–48, but "must come forward with specific facts showing that there is a genuine issue for trial," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis and quotation omitted). To determine whether a genuine issue of material fact exists for trial, the court views the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. See Scott v. Harris, 550 U.S. 372, 378 (2007).

12

<u>Arguments</u>:

In support of his motion for summary judgment against the moving defendants, plaintiff argues, among other things, that: on December 14, 2017, all defendants were aware both that he could not walk or move his right leg after the use-of-force incident, and that he had verbalized a request to go to the hospital; defendants were deliberately indifferent to his serious medical needs when they left him in a cell in excruciating pain for 28 hours instead of sending him for immediate emergency medical treatment; the gravity of his injury was apparent to any lay person because defendants had to physically lift and carry him and transport him in a wheelchair; the disorderly conduct violation that led to the use-of-force event was minor; because he was neither resisting nor posing serious risk of harm to any other inmate or officer, the force used was excessive; and defendants are not entitled to qualified or governmental immunity.   <u>See</u> [D.E. 105-1] at 1–28.

The moving defendants, in response, argue that the record evidence does not support plaintiff's entitlement to judgment as a matter of law as to any of the causes of actions asserted in his amended complaint.   <u>See</u> Defs.' Resp. [D.E. 129].

In support for their motion for summary judgment, the moving defendants argue plaintiff's federal claims are not supported by the evidentiary record.   Defs.' Mem. [D.E. 117] at 12.   As to excessive force, the moving defendants contend that only Jordan and Andrews were present during the use-of-force event, whereas McDaniel, Russell, Singleton III, Taylor, and Woolard were not.   <u>Id.</u> at 14.   The moving defendants also argue the force used was not excessive under the governing standard because: plaintiff was disruptive, exhibiting "pre-assaultive behaviors," and actively resisted Mobley's attempts to handcuff him; plaintiff has not shown a causal link between the moving defendants' actions and his injuries; the use of force was tempered because "Jordan

13

and Andrews only used such force as was necessary to immobilize and restrain" plaintiff; the moving defendants' used force as reasonably necessary to address to the security problem and perceived threat posed by plaintiff; and plaintiff was actively resisting.   Id. at 14–18.

As to deliberate indifference, the moving defendants argue that Gay was not deliberately indifferent to plaintiff's serious medical need because Sergeant Page, and not Gay, was the designated officer in charge such that "Page was the only individual officer present that day that had the authority to override Nurse McLean's decision not to immediately seek outside medical attention."   Id. at 19–20.   The moving defendants next argue that the deliberate indifference claim amounts to mere disagreement with plaintiff's course of medical treatment, and that any delay in treatment was due to plaintiff's misconduct and his physical and verbal resistance to Nurse McLean's attempts to conduct an evaluation.   Id. at 20–21.   The moving defendants further argue that, because they are not medical providers, they were justified on relying upon the medical expertise of Nurse McLean.   Id. at 23.   The moving defendants also argue that, due to plaintiff wearing "civilian clothes," they could not observe the injury, and they had no reason, aside from his subjective complaint, to suspect the injury was "sufficiently serious."   Id.

Next, the moving defendants argue that plaintiff may not advance a claim under the North Carolina Constitution because at least two adequate alternative state-based cause of actions exist and that such claims fail on the merits.   Id. at 24–27.   The moving defendants also argue that plaintiff may not raise new claims against them either in his memorandum in support of his motion for summary judgment or in opposition to their motion for summary judgment.   See id. at 27–28.

In his response, plaintiff intermixes arguments with his disagreements as to defendants' statement facts, writing: he "does recount all defendants mentioned in the amended complaint as

14

being present in the Booking Area on the morning of December 14, 2017, besides Lieutenant Gay";
Jordan and Andrews could not assume that he could become violent because he "has received only
1 infraction involving any physical violence and another person or any assaultive behavior," and
this infraction occurred on July 30, 2013; he did not "resist arrest" or "jerk away" from Mobley,
but "was pulled away from the window by his left arm by Sergeant Page while Officer Mobley
was attempting to place handcuffs on him"; "no threat was present and order did not need to be
reestablished because Plaintiff was already on the ground when Officer Andrews took control of
his legs"; Gay was the only officer in the room with plaintiff and Nurse McLean; he did not resist
an examination, but he complained Nurse McLean was hurting him and he needed to go to the
hospital; McLean refused to fully examine him because of his complaints and instead told officers
to take him "to the D-5 housing unit because if he could tell her to stop touching his leg then he
was o.k. and nothing was wrong"; McDaniel, not Russell, helped plaintiff change out of his clothes
and into a safety smock; contra defendant's statements, his "deformity" was obvious; defendants,
not plaintiff, "relayed information to medical personnel that his right hip was broken"; Nurse
McLean noticed plaintiff's hip was internally rotated on Dec. 14, 2017; and "he has never received
any infractions/Inmate Tickets for threating another inmate, instigating fights with another inmate,
or engaging in fights with another inmate."   See Pl.'s Resp. [D.E. 133] at 3–5.

        Plaintiff also argues that, although the moving defendants note that the only causes of
action permitted to proceed through discovery were plaintiff's excessive force claims against
McDaniel, Jordan, Andrews, Taylor, Russell, Singleton III, and Woolard, and plaintiff's deliberate
indifference claim against Gay, both under the Fourteenth Amendment, "it can be reasonably
inferred by the face of Plaintiff's amended complaint that Plaintiff's use of force claim falls under,

and is governed by, the Fourth Amendment prohibition to be free from unreasonable searches and seizures [sic]." Id. at 5.

Plaintiff also argues that his evidentiary filings support his causes of action and could "return a verdict in favor of the Plaintiff [sic]," such that there are issues of material fact. Id.

Plaintiff adopts and incorporates by reference his memorandum in support of his motion for summary judgment, and asserts that defendants are "no longer credible due to their perjury in the affidavit of Craig Pierce . . . and in the affidavit of William Gay [sic]." Id. at 6.

In his supplemental response, plaintiff contests defendants' averments that they did not observe any deformity to his legs or hips. See Pl.'s Supp. Resp. [D.E. 136] at 1. Plaintiff argues these statements conflict with "medical records by a licensed professional" that recounted "there was an obvious deformity" in his right hip. Id. Plaintiff contends that Gay, Jordan, Andrews, and Russell have "perjured themselves [sic]." Thus, plaintiff argues, the court should "not consider defendants' motion for summary judgment, their response in opposition . . . or any other argument made by them [sic]," but should instead "grant his motion for summary judgment" Id.

In support of his motion for summary judgment as to Page and Mobley, plaintiff merely cites to his previous arguments in support summary judgment. See Pl.'s Mem. [D.E. 179-1] at 2.

Discussion:

As an initial matter, because plaintiff's cause of action arose when he was a pretrial detainee at the Detention Center, the court rejects plaintiff's arguments in reliance on the Fourth Amendment; his claims instead sound under the Fourteenth Amendment's Due Process Clause. See Kingsley v. Hendrickson, 576 U.S. 389, 400–01 (2015); Mays v. Sprinkle, 992 F.3d 295, 300 (4th Cir. 2021); cf. Graham v. Connor, 490 U.S. 386, 388 (1989).

16

As to excessive force, because "the appropriate standard for a pretrial detainee's excessive force claim is solely an objective one[,]" it is enough that plaintiff show that the "force purposely or knowingly used against him was objectively unreasonable." Kingsley, 576 U.S. at 397. Thus, the court considers whether, under the "facts and circumstances" of this case, and from the "perspective of a reasonable officer on the scene," the force used was objectively excessive. Id.

As to deliberate indifference, a Fourteenth Amendment analysis is indistinguishable from an Eighth Amendment analysis. Brown v. Harris, 240 F.3d 383, 388–89 (4th Cir. 2001); Martin v. Gentile, 849 F.2d 863, 870 (4th Cir. 1988) ("The due process rights of a pretrial detainee are at least as great as the eighth amendment protections available to the convicted prisoner."); see Mays, 992 F.3d at 301 (noting the Fourth Circuit has not decided "whether *Kingsley*'s excessive-force-claim rationale extended to deliberated-indifference claims"). Plaintiff "can make out a violation at least where 'he shows deliberate indifference to serious medical needs under cases interpreting the Eighth Amendment.'" Mays, 992 F.3d at 300 (quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976)); see Farmer v. Brennan, 511 U.S. 825, 835 (1994) ("[D]eliberate indifference entails something more than mere negligence . . . [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.").

> An Eighth Amendment claim for deliberate indifference to serious medical needs includes objective and subjective elements. The objective element requires a "serious" medical condition. A medical condition is objectively serious when it either is "diagnosed by a physician as mandating treatment" or is "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." And for the subjective element, the prison official must have acted with a "sufficiently culpable state of mind."

Mays, 992 F.3d at 300 (internal citations omitted); see also Jackson v. Lightsey, 775 F.3d 170, 178 (4th Cir. 2014) (noting subjective prong of a deliberate indifference claim requires proof of "actual

17

subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by [the official's] action or inaction."); Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008) (noting that, beyond actual knowledge, the official "must also have recognized that his actions were insufficient to mitigate the risk of harm to the inmate").

Succinctly stated, because plaintiff has demonstrated neither the absence of a genuine issue of material fact nor the absence of evidence to support the nonmoving parties' case, cf. Celotex, 477 U.S. at 325, plaintiff is not entitled to judgment as a matter of law on either of his pending motions for summary judgment, see Anderson, 477 U.S. at 249–50; Desmond v. PNGI Charles Town Gaming, L.L.C., 630 F.3d 351, 354 (4th Cir. 2011) ("When cross-motions for summary judgment are before a court, the court examines each motion separately, employing the familiar standard under Rule 56 of the Rules of Civil Procedure."); see also Robinson v. Wix Filtration Corp. LLC, 599 F.3d 403, 409 n.8 (4th Cir. 2010) ("In considering a motion for summary judgment, the district court 'must review the motion, even if unopposed, and determine from what it has before it whether the moving party is entitled to summary judgment as a matter of law.' 'Although the failure of a party to respond to a summary judgment motion may leave uncontroverted those facts established by the motion,' the district court must still proceed with the facts it has before it and determine whether the moving party is entitled to judgment as a matter of law based on those uncontroverted facts." (citation omitted)).

The court now turns to the moving defendants' joint motion for summary judgment. Considering the record evidence and the reasonable inferences drawn therefrom in the light most favorable to plaintiff, Scott, 550 U.S. at 378, there are genuine issues of material fact as to whether the December 14, 2017, use of force by Jordan and Andrews was objectively reasonable or

18

excessive, see Kingsley, 576 U.S. at 397. Accordingly, the court denies summary judgment as to these defendants on plaintiff's excessive force claim. See Anderson, 477 U.S. at 249–50.

By contrast, McDaniel, Russell, Singleton III, Taylor, and Woolard all aver that they did not use any force on plaintiff on the relevant date. See Defs.' J.A., McDaniel Aff. [D.E. 119-4] at ¶12; Taylor Aff. [D.E. 119-9] at ¶¶7–8; Russell Aff. [D.E. 119-11] at ¶¶7–8; Singleton Aff. [D.E. 119-12] at ¶¶7–9; Woolard Aff. [D.E. 119-13] at ¶¶6–8. Accepting as true plaintiff's relevant averments–that "[a]ll defendants besides Lieutenant Gay were present in the booking area," "McDaniel was not in a separate section of booking," and "Russell, Singleton III, Taylor, and Woolard were present in the booking area," Pl.'s Aff. [D.E. 133-2] at ¶¶24, 45, 46–there still is no showing that these defendants were personally involved in the use-of-force event, see Williamson v. Stirling, 912 F.3d 154, 171 (4th Cir. 2018) (providing § 1983 liability requires that "the official's own individual actions must have violated the Constitution," and finding that an official's "mere knowledge of such a deprivation does not suffice" (citing Iqbal, 556 U.S. at 676)).

Considering the record evidence and the reasonable inferences in the light most favorable to plaintiff, Scott, 550 U.S. at 378, the moving defendants have demonstrated the absence of evidence to support an excessive-force claim against McDaniel, Russell, Singleton III, Taylor, and Woolard, see Celotex, 477 U.S. at 325, whereas plaintiff does not "come forward with specific facts showing that there is a genuine issue for trial," Matsushita, 475 U.S. at 587. Thus, these defendants are entitled to summary judgment on this claim. See Anderson, 477 U.S. at 249–50.

As to the deliberate indifference claim against Gay, the operative complaint alleges that Gay "denied [plaintiff] outside medical treatment for [his] injury, leaving [plaintiff] in a cell in excruciating and unbearable pain for a 28-hour time period." 2d Am. Compl. [D.E. 10] at 7.

19

The court accepts as true plaintiff's version of the relevant facts. See Pl.'s Stmt. Mat. Facts. Opp'n Defs.' Mot. for Summ. J. [D.E. 133-1] at ¶¶59–69 (stating: Gay "responded to the booking area with Nurse McLean just after the incident took place," but "did not join the other detention officers as they escorted plaintiff to medical"; plaintiff did not resist the examination, but "stated continually that McLean was hurting him more and that he needed to go to the hospital"; "the only officer present in the room . . . was Sergeant Gay"; "Nurse McLean told officers to take [him] to the D-5 unit because if Plaintiff could tell her to stop touching his leg then he was ok and nothing was wrong"; he was taken to a D-5 housing unit cell; and plaintiff "made McLean and Defendants aware on December 14, 2017, that he needed to go to the hospital for outside care and that McLean was only increasing the already unbearable pain during her exam").

Plaintiff's argument, distilled, is that Gay was deliberately indifferent to his serious medical needs by not overruling Nurse McLean and seeking immediate outside medical care for plaintiff because, after the use-of-force event, plaintiff could not walk, his hip deformity was "obvious," Nurse McLean observed his hip was "rotated," and defendants "relayed information to medical personnel that his right hip was broken." See Pl.'s Resp. [D.E. 133] at 3–5.

Courts generally may rely on medical records concerning the examination and treatment of an inmate. See Bennett v. Reed, 534 F. Supp. 83 , 87 (E.D.N.C. 1981), aff'd, 676 F.2d 690 (4th Cir. 1982); see also Oliver v. Daniels, No. 5:16-CT-3101-FL, 2019 WL4858847, at *12 (E.D.N.C. Sept. 30, 2019), appeal dismissed, 2019 WL 8405461 (4th Cir. Oct. 31, 2019).

The record reflects several Detention Center progress notes contemporaneous to the events at issue in this case. The first progress note, dated December 14, 2017, at 9:40 a.m., reflects:

Called to booking–force need on IM [inmate] while being booked out–c/o [complains of] R [right] hip "broken" [sic]. Evasive when asked about where it

20

hurts. Sitting leaned back in wheelchair–no diaphoresis–no grimace when not being talked to. Has R hip internally rotated–+2 pulses distal–strong resistance to attempt to examine leg. Refuses to allow exam. Able to lift leg up when rolling wheelchair– no foot pedestals in use. Plan hold transfer to DOC [North Carolina Department of Corrections]–hold here until he agrees to exam and settles his anger. Will see then.

Defs.' App. [D.E. 119-14] at 3.

The next progress note, dated December 14, 2017, at 11:30 a.m., but bearing a different

signature than the 9:40 a.m. progress note, reflects the following:

"I/M [inmate] to medical via wheelchair c/o [complains of] generalized pain. Ankles noted to be crossed and legs crossed turned to R [right] side. I/M [inmate] to follow up [with] FNP [Family Nurse Practitioner] in AM [morning]. Motrin 800mg given. Will start Motrin 800mg PO [by mouth] Tid [three times a day].").

Id. at 2.

The next progress note, dated December 15, 2017, at 10:40 a.m., reflects the following:

IM [inmate] required assist to be transported to medical clinic. Initially refused care since last night. [Emergency Response Team] required to bring him to clinic–no diaphoresis–no c/o [complaint of] pain unless leg is moved. Then he describes intense R [right] hip pain. + 2 pulses DP [dorsalis pedis] / PT pop [posterior tibial popliteal]. Internally rotated at hip. [No] leg swelling. IM observed prior to transport to clinic in his cell up on all fours "because it feels tight." Had refused to be seen but urged evaluation. Transferred to exam table for xray–R [right] femur view no acute fracture noted – R [right] hip dislocated . . . . Plan EMS [Emergency Medical Services] transfer to Vidant ED [emergency department]–report given to EMS/Vidant. [Inmate] reports NPO [nothing by mouth] since yesterday evening.

Id.

Next, a progress note dated December 15, 2017, at 11:20 a.m., reflects that plaintiff was

transported by Emergency Medical Services to the Vidant Hospital emergency department.    Id.

Next, a progress note dated December 15, 2017, at 3:45 p.m., notes plaintiff returned from

the hospital in a wheelchair with his right knee immobilized and "verbalized pain was a lot better,"

and that a follow up was planned with the Family Nurse Practitioner on December 18.    Id. at 1.

21

The record also reflects that the notation of "obvious deformity" was made by the medical providers at Vidant Medical Center on December 15, 2017, the day after the use-of-force event. See Pl.'s Mem. Attach. [D.E. 133-4] at 4 (medical record stating: "right hip and knee pain with obvious deformity. Xray confirmed hip dislocation at outside facility).

Although plaintiff disputes that he was taken to medical immediately after the use of force, Pl.'s Stmt. Mat. Facts. Opp'n Defs.' Mot. for Summ. J. [D.E. 133-1] at ¶¶59–61, this delay was not ascribed to Gay. Plaintiff states that, after a limited examination for which Gay was present, Nurse McLean opined that plaintiff "was ok and nothing was wrong" and told officers to take him to a cell. Id. at ¶¶ 62, 66–67. This indicates that, despite plaintiff's complaints pain, wheelchair use, and requests to go to the hospital, Nurse McLean did not believe the injury was serious.

Although plaintiff contends that Gay should have overruled Nurse McLean and ensured that he received outside medical treatment, see Pl.'s Resp. [D.E. 133] at 3–5, plaintiff does not dispute Gay's averment that he lacked authority to do so, see Gay Aff. [D.E. 119-1] (averring that: only the Shift Lieutenant or, in her absence the Officer In Charge ("OIC"), has the authority to request Emergency Medical Services; Lieutenant Poston was the scheduled Shift Lieutenant; and that, due to Lieutenant Poston's absence on Dec. 14, 2017, Sergeant Page was the appointed OIC).

Even if Gay actually had the authority to obtain outside medical care, because Gay is not alleged to be a medical provider, Gay generally is entitled to rely upon Nurse McLean's medical opinion. See Iko, 535 F.3d at 242 ("If a prisoner is under the care of medical experts . . . a nonmedical prison official will generally be justified in believing that the prisoner is in capable hands." (quotation omitted)); see also Lewis v. Hoke Cnty., No. 1:17CV987, 2020 WL 5213929, at *7 (M.D.N.C. Sept. 1, 2020) ("[P]rison officials without medical training are responsible for

22

seeing that prisoners are attended to by medical professionals. They are not responsible for determining the course of treatment or for overruling the opinions of those professionals." (citation omitted)), report and recommendation adopted, No. 1:17CV987, 2022 WL 292928 (M.D.N.C. Feb. 1, 2022), aff'd, No. 22-6171, 2022 WL 1641282 (4th Cir. May 24, 2022).

Although contemporaneous medical records indicate that Detention Center providers noted plaintiff's wheelchair use, positioning, and complaints of pain, and that, on the following day, Vidant Hospital providers, with the benefit of x-rays, noted an "obvious deformity," there is no showing, aside from plaintiff's bald say-so, that these medical providers' knowledge can be imputed to Gay, or that Gay was subjectively aware that heeding Nurse McLean's apparently erroneous medical advice was unreasonable. See Anderson, 477 U.S. at 252 (noting that the "mere existence of a scintilla of evidence" favoring the non-moving party will not prevent the entry of summary judgment); Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 522 (4th Cir. 2003) (providing "neither '[u]nsupported speculation,' nor evidence that is 'merely colorable' or 'not significantly probative,' will suffice to defeat a motion for summary judgment" (internal citations omitted)); see also Farmer, 511 U.S. at 844 (finding that even an official "who actually [knows] of a substantial risk to inmate health or safety may be found free from liability if [he] responded reasonably to the risk, even if the harm ultimately was not averted.").

Because plaintiff fails to demonstrate that Gay knew of and disregarded his serious medical needs, or otherwise acted with the requisite culpable state of mind, plaintiff fails to satisfy the subjective component of a deliberate indifference claim. See Mays, 992 F.3d at 300; Jackson, 775 F.3d at 178; Iko, 535 F.3d at 241. Plaintiff's claim instead reflects his disagreement with his course of medical treatment or, at worst, negligent medical care by Nurse McLean. See Farmer,

23

511 U.S. at 835; Estelle, 429 U.S. at 107 ("A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment"); Grayson, 195 F.3d at 695; Russell v. Sheffer, 528 F.2d 318, 318–19 (4th Cir. 1975) (per curiam) (noting that a prisoner is not entitled to his choose course of medical treatment and that disagreements over forms of treatment concern medical judgments, not the Eighth Amendment).

After viewing the evidence and inferences in the light most favorable to plaintiff, Scott, 550 U.S. at 378, because there is no genuine issue of material fact as to the deliberate indifference claim, Gay is entitled to judgment as a matter of law. See Anderson, 477 U.S. at 248–49; Matsushita, 475 U.S. at 587 (finding summary judgment is proper "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." (citation omitted)).

Next, although the plaintiff raises claims under the North Carolina Constitution, see 2d Am. Compl. [D.E. 10] at 7 (citing N.C. Const. Art. I, §§ 1, 18, 19, 27, 32), "[t]o assert a direct constitutional claim . . . a plaintiff must allege that 'no state remedy exists to provide relief for the injury.'" Edwards v. City of Concord, 827 F. Supp. 2d 517, 521 (M.D.N.C. 2011) (quoting Copper v. Denlinger, 363 N.C. 784, 788, 688 S.E.2d 426, 428 (2010)). "An adequate remedy is one that 'provide[s] the possibility of relief under the circumstances.'" Id. (quoting Craig ex rel. Craig v. New Hanover Cnty. Bd. of Educ., 363 N.C. 334, 340, 678 S.E.2d 351, 355 (2009)).

Because plaintiff fails to demonstrate that he lacks adequate alternative state common law remedies to address the alleged wrongdoing of the moving defendants, the court grants the moving defendants' motion for summary judgment as to claims premised upon the North Carolina Constitution. See Anderson, 477 U.S. at 248–49; Edwards, 827 F. Supp. 2d at 521; cf. Corum v. Univ. of N. Carolina Through Bd. of Governors, 330 N.C. 761, 783, 413 S.E.2d 276, 290 (1992).

24

To the extent plaintiff instead raises new claims against the moving defendants, he may not do so either in a motion for summary judgment or in a response to a motion for summary judgment. See Cloaninger ex rel. Est. of Cloaninger v. McDevitt, 555 F.3d 324, 336 (4th Cir. 2009); see also Barclay White Skanska, Inc. v. Battelle Mem'l Inst., 262 F. App'x 556, 563 (4th Cir. 2008) (unpublished) (citation omitted). Accordingly, such new claims are dismissed without prejudice.

Finally, the court notifies all parties that the court is considering entering partial summary judgment for non-moving defendants under Fed. R. Civ. P. 56(f), on the grounds discussed above, as to plaintiff's deliberate-indifference claims, newly raised claims, and claims premised upon the North Carolina Constitution. The parties shall have until December 5, 2022, to file any response.

<u>Conclusion</u>:

For the reasons discussed above, the court:

- DENIES both plaintiff's pending motions for summary judgment [D.E. 105, 179];

- GRANTS IN PART the moving defendants' motion for summary judgment [D.E. 116] as to the excessive-force claims against McDaniel, Russell, Singleton III, Taylor, and Woolard, as to the deliberate-indifference claim against Gay, and as to claims premised on the North Carolina Constitution against all moving defendants;

- DENIES the moving defendants' motion for summary judgment [D.E. 116] as to the excessive-force claims against Jordan and Andrews;

- DISMISSES WITHOUT PREJUDICE plaintiff's newly raised claims;

- ALLOWS the parties until December 5, 2022, to file a response, if any, to the court's notice under Fed. R. Civ. P. 56(f);

- DIRECTS the clerk to TERMINATE as defendants McDaniel, Russell, Singleton III, Taylor, Woolard, and Gay; and

- NOTIFIES the parties that the case will be referred to United States Magistrate Judge Robert B. Jones, Jr. for a court-hosted settlement conference at the appropriate time.

SO ORDERED, this 27th day of October 2022.

Richard E. Myers II
RICHARD E. MYERS II
Chief United States District Judge